```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
    LUIS ARNAUD,

                                Plaintiff,                              MEMORANDUM & ORDER

                -against-                                               18-CV-3703 (NGG) (SJB)

    DOCTOR'S ASSOCIATES INC., d/b/a
    SUBWAY,

                                Defendant.
-----------------------------------------------------------------------X
```
NICHOLAS G. GARAUFIS, United States District Judge.

  In this putative class action, Plaintiff Luis Arnaud brings suit on behalf of himself and all consumers in the United States who have allegedly received unsolicited and unconsented-to commercial text messages to their mobile phones from Defendant Doctor's Associates Inc. d/b/a Subway ("Subway" or "Defendant"). (Compl. (Dkt. 1) ¶ 1.) Plaintiff claims that Defendant has violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 et seq., by using an automated telephone texting system to send unsolicited and unauthorized marketing text messages to the cellular phones of Plaintiff and the class members. (Id. ¶ 36.) Plaintiff seeks an order certifying the class under Federal Rule of Civil Procedure 23, declaring that Defendant's conduct violates the TCPA, and awarding statutory and treble damages for each violation of the TCPA. (Id. at 13.)

  Before the court is Defendant's motion to compel arbitration of Plaintiff's claim and stay proceedings in this action pending completion of the arbitration. (Def. Mot. to Compel Arbitration & Mot. to Stay Litig. ("Mot.") (Dkt. 27).) For the following reasons, Defendant's motion is DENIED.

1

I.   BACKGROUND

   A.   Facts

Unless otherwise noted, the following facts are undisputed. Where the facts are disputed, the court notes the dispute and credits Plaintiff's version of the facts. See Meyer v. Uber Techs., Inc., 868 F.3d 66, 74 (2d Cir. 2017) ("Courts deciding motions to compel . . . draw[] all reasonable inferences in favor of the non-moving party." (citation omitted)).

Plaintiff states that he is a citizen of the state of New York and a resident of Bronx County. (Compl. ¶ 5.) He alleges that, in October of 2016, he visited a Subway restaurant and made a purchase.[1] (Id. ¶ 14.) The receipt from Plaintiff's transaction stated that Plaintiff could get "a discount/free item" if he took an electronic survey following his visit. (Id.) Plaintiff took the survey, which asked him for personal information including his telephone number. (Id.) Plaintiff states that he provided his number in order to receive a discounted or free item, but insists that he never consented to receiving promotional text messages from Subway. (Id.) Defendant contends that Plaintiff did sign up to receive text offers from Subway, and that he "reaffirmed his assent" via text message. (See Mot. at 2 (citations omitted).)

Franchise World Headquarters, LLC ("FWH") provides services to Subway, including overseeing the www.subway.com website (the "Website"). (Dec. 28, 2018 Decl. of Mike Feinberg (Dkt. 29) ¶¶ 1-2.) In the ordinary course of FWH's business, it maintains archive copies of web offers available on the Website and records reflecting how the offers appeared during specific timeframes. (Id. ¶ 3.) It also maintains records of user opt-ins that occur on the Website and related user activity. (Id.) In April of 2016, the "Subway SMS Offers" promotion appeared on the Website as follows:

---

[1] Defendant states that Plaintiff signed up on www.subway.com on April 13, 2016, meaning that Plaintiff's visit to Subway must have occurred prior to the date alleged in the complaint. (See Mot. at 2.)






(Id.)  Users who signed up via this webpage had to enter their mobile phone number and zip code, click on a CAPTCHA[2] verification, and click the "I'm In" button in order to receive messages.  (Id. ¶ 4.)  Below that button, the webpage includes more information, including large green text in all capital letters that reads: "THIS PAGE IS NOT A COUPON, OFFER WILL BE SENT TO YOUR SMARTPHONE VIA TEXT MESSAGE." (Id. ¶ 3.)  Below that, in smaller print, it states, "Msg/data rates may apply. Max 10 msgs/mo. Msgs may be autodialed. Consent not required to buy goods/svcs Only available for smartphones with a data plan."  (Id.)  Below that appeared two links, one labelled "T&Cs" and the other labelled "Privacy."  (Id.)  Anyone who clicked on the link labelled "T&Cs" was taken to a document titled "TERMS AND CONDITIONS."  (See Terms of Use Document ("Terms of Use") (Dkt. 28-1) at 1.)  Section 14 of that document was titled "Choice of Law and Dispute Resolution" and, in relevant part, it provides as follows:

> Any controversy or claim arising out of or relating to this Website or the breach of the Terms of Use shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association at a hearing to be held in Bridgeport, Connecticut in the United States of America or such other location in the State of Connecticut designated by the American Arbitration Association. . . . The commencement of arbitration proceedings by an aggrieved party to settle disputes arising out of or relating to this Website is a condition precedent to the commencement of legal action by either party.

(Id. at 5.)

According to Defendant, Plaintiff clicked on the "I'm In" button and received a confirmation text to his phone number: "Reply Y as ur sig 2agree 2 SUBWAY offers 2 this ph# (max10msgs/mo-Msgs may b autodialed-Consent not req'd 2buy goods/svcs) Reply HELP=help

---

[2] CAPTCHA is "a computer security program . . . that is designed to distinguish between human users and computer programs."  Ticketmaster L.L.C. v. RMG Techs., Inc., 507 F. Supp. 2d 1096, 1102 (C.D. Ca. 2007).  Here, the CAPTCHA required the user to click a box next to the phrase "I'm not a robot" before allowing the user to continue.

Msg&data rates apply." (Mot. at 3-4.) Defendant states that Plaintiff replied to this message with the letter "Y." (Id. at 3-4.) Plaintiff says that, although he clicked the "I'm in" button on the website, he did not understand that as constituting his signature to a contract. (Compl. ¶ 14; see also Opp'n at 6.) Moreover, he insists that he never replied "Y" to a text message, and that he knows this because he "has a habit of not responding to impersonal texts of this nature." (Opp'n at 6; see also Compl. ¶¶ 14-15.)[3]

After he disclosed his information to Subway, Plaintiff alleges that he began to receive frequent text messages from Subway about various promotions, deals, and discounts. (Compl. ¶ 15.) Other putative class members allegedly received the same messages around the same time as Plaintiff. (Id. ¶¶ 16, 18.) Based on the "impersonal nature of the messages" and the fact that they came from a "short code number," Plaintiff surmises that Subway "uses an auto dialer/texter" to send its promotional messages. (Id. ¶ 16.) Plaintiff found the messages to be "unwanted, annoying, and a nuisance." (Id. ¶ 18.) The messages disrupted Plaintiff and diminished the usage and enjoyment of his phone. (Id.) On June 28, 2017, he texted the word "STOP" to the number that Subway uses to send its messages but the messages kept coming. (Id.; see List of Messages (Dkt. 1-1 at ECF p.6) at ECF p.14.)

B. **Procedural History**

Plaintiff filed his complaint on June 26, 2018. (Compl.) Defendant was served with the complaint on September 17, 2018 (Returned Summons (Dkt. 11)) and, subsequently, requested and received an extension of time until November 8, 2018 in which to answer. (Nov. 10, 2018 Order.) Defendant answered the complaint on November 7, 2018 (Answer (Dkt. 23)) and filed

---

[3] Defendant submitted a declaration discussing records of its text messaging system, but the declaration is not dated. (Decl. of Alek Zdziarski (Dkt. 30) at 3.) The court therefore declines to consider it as evidence. See 28 U.S.C. § 1746.

5

its fully briefed motion to compel arbitration on February 1, 2019 (Mot.; Pl. Mem. in Opp'n to Mot. ("Opp'n") (Dkt. 33); Def. Reply Mem. in Supp. of Mot. ("Reply") (Dkt. 34)). Discovery has been stayed pending this court's decision on Defendant's motions. (Nov. 26, 2018 Order.)

In its motion, Defendant argues that Plaintiff is bound by the arbitration provision in the Terms of Use because notice was provided to him and he manifested his assent to the Terms of Use. (Mot. at 5-7.) Further, it asserts that Plaintiff's claim falls within the scope of the arbitration provision, and that, "[t]o the extent that plaintiff raises any challenges to the scope or validity of the arbitration provision," those questions must be resolved by the arbitrator rather than the court. (Id. at 8.) In opposition, Plaintiff argues that he is not bound by the Terms of Use because "Defendant failed to clearly communicate a contract offer to Plaintiff, put him on notice of terms, or get a manifestation of his assent via something he would understand as a signature." (Opp'n at 6.) Additionally, Plaintiff contends that the contract is void because it is ambiguous as to which set of rules—the American Arbitration Association ("AAA") Commercial Arbitration Rules or the AAA Consumer Arbitration Rules—would apply in arbitration (id. at 7), and that it is unenforceable because it is procedurally and substantively unconscionable (id. at 9-14, 15-17). Finally, Plaintiff argues that even if the arbitration provision would otherwise be binding, the court should decline to enforce it because it would prevent effective vindication of the TCPA. (Id. at 14-15.)

On June 4, 2019, this court ordered Defendant to submit a letter explaining which state contract law it believes applies to the question of whether the parties entered into a binding arbitration agreement. (June 4, 2019 Order (Dkt. 36).) Defendant did so on June 14, 2019, expressing both its and Plaintiff's views on the topic. Plaintiff believes that New York law should apply. (Def. June 14, 2019 Letter (Dkt. 38) at 1.) Defendant states that either New York

or Connecticut law should apply and claims that the outcome would be the same under either state's law. (Id. at 2-3.)

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). "This policy is founded upon 'a desire to preserve parties' ability to agree to arbitrate, rather than litigate, their disputes.'" Starke v. SquareTrade, Inc., 913 F.3d 279, 288 (2d Cir. 2019) (quoting Schnabel v. Trilegiant Corp., 697 F.3d 110, 118 (2d Cir. 2012) (alteration adopted)). Under Section 4 of the FAA, a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may file a motion to compel, which a court must grant "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4; see also AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 354-55 (2011). Despite the FAA's "liberal federal policy favoring arbitration agreements," CompuCredit Corp. v. Greenwood, 565 U.S. 95, 98 (2012) (citation omitted), "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," In re Am. Express Fin. Advisors Sec. Litig., 672 F.3d 113, 127 (2d Cir. 2011) (quoting Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002)); see also Am. Express Co. v. Italian Colors Rest., 570 U.S. 228, 233 (2013) (noting that "courts must rigorously enforce arbitration agreements according to their terms" (internal quotation marks and citation omitted) (emphasis added)).

7

Thus, a motion to compel arbitration requires the court to address two issues: (1) whether the parties have entered into a valid agreement to arbitrate, and (2) if so, whether the dispute at issue falls within the scope of the parties' agreement to arbitrate. See In re Am. Express Fin. Advisors Sec. Litig., 672 F.3d at 128; see also Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 299 (2010) ("[C]ourts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." (emphasis in original)). The first question—whether the parties have agreed to arbitrate in the first place—"is one only a court can answer, since in the absence of any arbitration agreement at all, questions of arbitrability could hardly have been clearly and unmistakably given over to an arbitrator." VRG Linhas Aereas S.A. v. Matlin Patterson Global Opportunities Partners II L.P., 717 F.3d 322, 325 n.2 (2d Cir. 2013) (quotation marks omitted). In evaluating the second question—whether the scope of the agreement to arbitrate covers the dispute at issue—"courts presume that the parties intend courts, not arbitrators, to decide . . . disputes about 'arbitrability.'" BG Grp., PLC v. Republic of Argentina, 572 U.S. 25, 34 (2014). Thus, unless the parties have "clearly and unmistakably" delegated to an arbitrator the authority to resolve issues of arbitrability, Howsam, 537 U.S. at 83, "the question of whether or not a dispute is arbitrable is [also] one for the court." Citigroup Global Mkts. Inc. v. Abbar, 761 F.3d 268, 274 (2d Cir. 2014) (quotation marks and citation omitted). Where courts have the authority to make this determination, the federal policy in favor of arbitration "requires that any doubts concerning the scope of arbitrable issues be resolved in favor of arbitration." Telenor Mobile Commc'ns AS v. Storm LLC, 584 F.3d 396, 406 (2d Cir. 2009) (quotation marks and citation

8

omitted). The question of whether an agreement to arbitrate exists between the parties is governed by state contract law. Meyer, 868 F.3d at 73-74.

In deciding a motion to compel arbitration, "the court applies a standard similar to that applicable to a motion for summary judgment." Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003); see also Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 172 (2d Cir. 2011) ("If there is a genuinely disputed factual issue whose resolution is essential to the determination of the applicability of an arbitration provision, a trial as to that issue will be necessary; but where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, we may rule on the basis of that legal issue and 'avoid the need for further court proceedings.'" (quoting Bensadoun, 316 F.3d at 175)). As a result, allegations related to arbitrability are evaluated to determine "whether they raise a genuine issue of material fact that must be resolved by a fact-finder at trial." Schnabel, 697 F.3d at 113. In addition, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 91 (2000); see also Whitehaven S.F., LLC v. Spangler, 45 F. Supp. 3d 333, 342 (S.D.N.Y. 2014) ("Whether it argues that arbitration is improper because the arbitration agreement is invalid under a defense to contract formation, or asserts that the arbitration contract does not encompass the claims at issue, either way, the resisting party shoulders the burden of proving its defense." (quotation marks and citation omitted)). The court may consider "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits." Meyer, 868 F.3d at 74 (quotation marks and citations omitted) (alteration adopted).

9

## III. DISCUSSION

Here, the parties dispute whether Plaintiff entered into an arbitration agreement at all, which is a question for the court to answer. See VRG Linhas Aereas, 717 F.3d at 325 n.2. For the following reasons, the court finds that an agreement to arbitrate does not exist between the parties.

### A. Applicable Law

The question of whether an agreement to arbitrate exists between the parties is governed by state contract law. Meyer, 868 F.3d at 73-74. And "[i]ssues of contract formation . . . are governed by the choice-of-law doctrine of the forum state." Guan v. Uber Techs., Inc., 236 F. Supp. 3d 711, 721 (E.D.N.Y. 2017) (citing, inter alia, Specht v. Netscape Comms'ns Corp., 150 F. Supp. 2d 585, 590 (S.D.N.Y. 2001)). "Under New York choice-of-law rules, courts first determine whether there is a substantive conflict between the laws of the relevant choices." Feldman Law Grp. P.C. v. Liberty Mut. Ins. Co., 819 F. Supp. 2d 247, 255 (S.D.N.Y. 2011) (citing GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc., 449 F.3d 377, 382 (2d Cir. 2006)). "In the absence of substantive difference[,] a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it." Id. (quoting Int'l Bus. Mach. Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004)).

Here, Defendant has its principal place of business in Connecticut (see Compl. ¶ 6; Def. June 14, 2019 Letter at 1), while Plaintiff is a citizen of the state of New York (Compl. ¶ 5). Moreover, Plaintiff allegedly received unlawful text messages from Defendant while in New York. (Id. ¶ 4.) Plaintiff believes New York law should apply (see Def. June 14, 2019 Letter at 1), and Defendants state that either New York or Connecticut law is appropriate (see id. at 2-3).

The court applies New York law because it does not appear that there is a substantive conflict between the two bodies of law.[4] See Feldman Law Grp. P.C., 819 F. Supp. 2d at 255.

### B. The Existence of an Arbitration Agreement

Defendant claims that Plaintiff agreed to arbitration by clicking the "I'm in" button, and again by responding "Y" to a confirmation text message. The court will first address Defendant's argument as to the webpage before turning to alleged text message exchange.

#### 1. The Webpage

"[I]n order to be binding, a contract requires a 'meeting of the minds' and a 'manifestation of mutual assent.'" Starke, 913 F.3d at 288 (quoting Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp., 715 N.E.2d 1050, 1053 (N.Y. 1999)). "The manifestation of mutual assent must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." Id. (citing, inter alia, Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 417 N.E.2d 541, 543 (N.Y. 1981)). "Generally, courts look to the basic elements of the offer and the acceptance to determine whether there was an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." Id. (citing Express Indus., 715 N.E.2d at 1053).

A party may be bound by contract terms she does not have actual notice of if she "is on inquiry notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." Id. (citation omitted) (emphasis in original). In determining whether a party has inquiry notice of a contract term, courts applying New York law "look to

---

[4] Compare Starke v. SquareTrade, Inc., 913 F.3d 279, 288 (2d Cir. 2019) (applying New York law and stating that a party may be bound by contract terms she does not have actual notice of if she "is on inquiry notice of them and assents to them through conduct that a reasonable person would understand to constitute assent" (emphasis in original)), with Schnabel, 697 F.3d at 120) (stating that under either California or Connecticut law, a party is bound by a provision "if he or she is on inquiry notice of the term and assents to it through conduct that a reasonable person would understand to constitute assent" (emphasis in original)).

11

whether the term was obvious and whether it was called to [her] attention." Id. (citation omitted). "This often turns on whether the contract terms were presented . . . in a clear and conspicuous way." Id. (citations omitted). "In the context of web-based contracts," New York law directs courts to "look to the design and content of the relevant interface" to determine whether the disputed contract term was presented in such a way that would put the party challenging them on inquiry notice. Id. (citations omitted).

Recent Second Circuit caselaw provides two directly on point examples: Meyer, 868 F.3d 66 and Nicosia v. Amazon.com, Inc., 834 F.3d 220 (2d Cir. 2016).[5] In Meyer, the Second Circuit applied California law—which applies "substantially similar rules" as New York law in this context—to determine that a user had agreed to contract terms contained in documents provided only by link. Meyer, 868 F.3d at 74, 76. In that case, the user saw a single screen with a "REGISTER" button, below which appeared the following text: "By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY," and included hyperlinks to documents titled "Terms of Service" and "Privacy Policy." Id. That page appeared as follows:

---

[5] Even more recently, the Second Circuit decided Starke, 913 F.3d 279, which applied substantially the same body of law as is applicable here. However, Starke is factually distinguishable from this case because, in Starke, the link to the disputed terms was contained in an email sent to the user after he bought the protection plan at issue. See id. at 294-95. In the present case—as in Meyer and Nicosia—the link to the terms was presented to the user at the same time and on the same page as the action button.



Id. at 82 Add. B. In holding that the user had agreed to the hyperlinked terms and conditions, the Meyer court noted the following facts:

- The payment screen was uncluttered, with relatively few fields and only one external link, id. at 78;

- The text including hyperlinks to the relevant documents was "spatially coupled" with, that is, it appeared directly below, the registration button, id.;

- The user did not need to scroll to see the links to the relevant documents, id.;

- The text including hyperlinks to the relevant documents was "temporally coupled" with, that is, it appeared at the same time as, the registration button, id.; and

- "[T]he language '[b]y creating an Uber account, you agree' [wa]s a clear prompt directing users to read the Terms and Conditions and signaling that their acceptance of the benefit of registration would be subject to contractual terms.'" Meyer, 868 F.3d at 79.

In Nicosia, on the other hand, the Second Circuit held that the plaintiff had plausibly stated a claim as to whether he had agreed to conditions of use linked to an online retailer's order page. 834 F.3d at 235. That webpage appeared as follows:



Id. at 241 add. B. The court found the following facts significant in its analysis:

- "The message itself—'By placing your order, you agree to Amazon.com's . . . conditions of use'—[wa]s not bold, capitalized, or conspicuous in light of the whole webpage," Nicosia, 834 F.3d at 237;

14

- The webpage contained numerous links, which appeared in several different colors, fonts, and locations, Nicosia, 834 F.3d at 237;

- There were multiple other buttons on the page, as well as numerous advertisements and promotions, id.; and

- The page contained the customer's personal address, credit card information, shipping option, and purchase summary, id.

The webpage in this case falls somewhere in between those two examples. As in Meyer, the link to the Terms of Use appeared at the same time as the "I'm In" button. The link and the button were separated by a few lines of text; further apart than in Meyer, but still relatively close to each other. The page was more cluttered than that in Meyer, but not quite as cluttered as the one at issue in Nicosia; it had some promotional materials, a photo, and bright colors, but only one other link and limited additional text information that might distract a user. As in Nicosia, the link was not particularly conspicuous in size or font (although it was one of the few blue items on the page, and so was set aside by its color). Finally, unlike the page in Meyer, the page did not include language that served as "a clear prompt directing users to read" the Terms of Use or that "signal[ed] that their acceptance of the benefit of registration would be subject to contractual terms.'" Meyer, 868 F.3d at 79. Indeed, no text anywhere on the webpage indicated that the user was agreeing to any additional terms, and the fact that the link was labeled "T&Cs" provides little or no notice to the user that he might be bound by additional information contained at that link.[6] This fact weighs heavily against finding that Plaintiff manifested assent to the Terms of Use. See Nicosia v. Amazon.com, Inc., 384 F. Supp. 3d 254, 266 (E.D.N.Y.

---

[6] Defendant correctly states that "[r]easonably prudent users also 'know that text that is highlighted in blue and underlined is hyperlinked to another webpage where additional information will be found.'" (Mot. at 6 (quoting Meyer, 868 F.3d at 78 (alteration adopted)).) The court agrees that a reasonably prudent user accessing the Website would understand that the text that was blue and underlined would link to another webpage with information. Unlike the page in Meyer, however, the Website did not contain any language indicating to users that they would be bound by terms contained on that hyperlinked webpage. Thus, although a reasonable user might know that they would find some information by following the hyperlink, she would not necessarily expect to find additional binding contract terms.

2019) (observing that "[t]he more the [webpage] design diverges from this basic layout—such as by placing the notice further away from the action button, cluttering the screen with potentially distracting content, or <u>omitting the language explicitly saying that by performing the action the user agrees to be bound by the terms</u>—the less likely courts are to find that inquiry notice has been provided" (emphasis added) (citations omitted)). Without language explicitly informing Plaintiff that clicking "I'm in" would constitute agreement to additional terms not contained on the page—and without especially clear and conspicuous display of the relevant links—merely placing the links on the same page as the action button is insufficient to provide inquiry notice. See Starke, 913 F.3d at 288 (holding that "[i]n the context of web-based contracts," New York law directs courts to "look to the design and content of the relevant interface" to determine whether the disputed contract term was presented in such a way that would put the party challenging them on inquiry notice).

    2.  <u>The Text Messages</u>

Defendant further argues that Plaintiff manifested his assent to the Terms of Use by responding to a text message sent to his phone. Based on the admissible evidence currently before the court, this remains a disputed fact—Defendant claims Plaintiff did respond; Plaintiff states he did not. However, as to the question of whether the parties entered into a binding arbitration agreement, Plaintiff's response—or lack thereof—is immaterial. Defendant avers that the text message sent to Plaintiff stated, "Reply Y as ur sig 2agree 2 SUBWAY offers 2 this ph# (max10msgs/mo-Msgs may b autodialed-Consent not req'd 2buy goods/svcs) Reply HELP=help Msg&data rates apply." (Mot. at 3-4.) This text message does not mention arbitrability or the Terms of Use; indeed, it references no external terms, and, to the court's knowledge, contains no

16

external links. Even if Plaintiff did reply "Y," therefore, that reply has no bearing on whether he had constructive notice about any additional terms.

## IV. CONCLUSION

For the foregoing reasons, the Defendant's motion is DENIED. The parties are directed to contact Magistrate Judge Sanket J. Bulsara's chambers to discuss next steps in this case.

SO ORDERED.

                                                                                       s/Nicholas G. Garaufis

Dated: Brooklyn, New York                                         NICHOLAS G. GARAUFIS
       September ___, 2019                                      United States District Judge